## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CUBIST PHARMACEUTICALS, INC.    )
        )
      Plaintiff,      )
        )
  v.          )   C.A. No. 09-189-GMS
        )
TEVA PARENTERAL MEDICINES, INC.,   )
TEVA PHARMACEUTICALS USA, INC.,   )
And TEVA PHARMACEUTICAL     )
INDUSTRIES LTD.,       )
        )
      Defendants.    )

## SECOND AMENDED ANSWER OF DEFENDANT
## TEVA PHARMACEUTICALS USA, INC.

Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") hereby answers the Complaint

filed by plaintiff Cubist Pharmaceuticals, Inc. ("Cubist"), as follows:

    1.    Teva USA admits that the Complaint purports to state an action under the patent

laws of the United States, Title 35, United States Code. Teva USA further admits that Teva

Parenteral Medicines, Inc. ("TPM") filed an Abbreviated New Drug Application No. 91-039

("ANDA No. 91-039") with the U.S. Food and Drug Administration ("FDA") seeking approval

to manufacture and sell Daptomycin for Injection, 500 mg /vial ("the TPM ANDA Product"), a

generic version of CUBICIN®, prior to the expiration of U.S. Patent Nos. 6,468,967 ("the '967

patent") and 6,852,689 ("the '689 patent"), both of which are listed in the FDA Orange Book as

expiring on September 24, 2019, and U.S. Patent No. RE39,071 ("the RE'071 patent"), which

is listed in the FDA Orange Book as expiring on June 15, 2016. Teva USA denies the

remaining allegations in paragraph 1 of the Complaint.

## PARTIES

2. On information and belief, Teva USA admits the allegations in paragraph 2 of the Complaint.

3. To the extent paragraph 3 makes allegations directed to TPM, no response is required from Teva USA. Teva USA admits that TPM is indirectly a wholly-owned subsidiary of Teva USA and otherwise denies the allegations of paragraph 3 directed to Teva USA.

4. Teva USA admits that it is a Delaware corporation with it principal place of business at 1090 Horsham Road, North Wales, Pennsylvania. Teva USA further states that it is indirectly a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd. ("Teva Ltd."). Teva USA denies the remaining allegations in paragraph 4 of the Complaint.

5. Because paragraph 5 makes allegations directed only to Teva Ltd., no response is required from Teva USA.

6. Teva USA admits that TPM is indirectly a wholly owned subsidiary of Teva USA, which is indirectly a wholly owned subsidiary of Teva Ltd. TPM otherwise denies the allegations of paragraph 6 of the Complaint. To the extent that paragraph 6 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

7. Teva USA understands that Plaintiff is using the term "Teva" in its Complaint to refer to TPM, Teva USA and Teva Ltd. collectively, but denies that it is appropriate to do so. Teva USA will respond to such allegations as if they were directed to it separately.

8. Teva USA admits that it manufactures and sells various generic drug products and regularly conducts business throughout the United States, including in the State of Delaware. To the extent that paragraph 8 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

9.    Teva USA admits that subject matter jurisdiction in this Court is proper as to TPM pursuant to 28 U.S.C. §§ 1331 and 1338(a). Teva USA denies the remaining allegations in paragraph 9 of the Complaint.

10.    Teva USA admits, for purposes of this action only, that venue with respect to Teva USA is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b). To the extent that paragraph 10 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

11.    Teva USA admits, for purposes of this action only, that it is subject to personal jurisdiction in the State of Delaware because it has submitted itself to the jurisdiction of courts in Delaware by virtue of its incorporation under Delaware law. Teva USA denies the remaining allegations of paragraph 11 directed to it. To the extent that paragraph 11 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

BACKGROUND

12.    Upon information and belief, Teva USA admits that CUBICIN® is indicated for certain complicated skin and skin structure infections, including ones caused by susceptible isolates of certain Gram-positive microorganisms including *Staphylococcus aureus*, including methicillin-resistant isolates. Upon information and belief, CUBICIN® is also indicated for the treatment of *S. aureus* bloodstream infections (bacteremia), including right-sided infective endocarditis caused by methicillin-susceptible and methicillin-resistant isolates. Teva USA denies the remaining allegations in paragraph 12 of the Complaint.

13.    Upon information and belief, Teva USA admits the allegations in paragraph 13 of the Complaint.

14. Upon information and belief, Teva USA admits that United States Patent No. 6,468,967 ("the '967 patent") states on its face that it is entitled "Methods for Administration of Antibiotics" and further states that it was issued on October 22, 2002 and is assigned on its face to Cubist. Upon information and belief, Teva USA admits that the '967 patent is listed in the FDA Orange Book as expiring on September 24, 2019. Teva USA further admits that what appears to be a true and correct copy of the '967 patent was attached to the Complaint as Exhibit A. Teva USA denies the remaining allegations of paragraph 14.

15. Upon information and belief, Teva USA admits that United States Patent No. 6,852,689 ("the '689 patent") states on its face that it is entitled "Methods for Administration of Antibiotics" and further states that it was issued on February 8, 2002 and is assigned on its face to Cubist. Upon information and belief, Teva USA admits that the '689 patent is listed in the FDA Orange Book as expiring on September 24, 2019. Teva USA further admits that what appears to be a true and correct copy of the '689 patent was attached to the Complaint as Exhibit B. Teva USA denies the remaining allegations of paragraph 15.

16. Upon information and belief, Teva USA admits that United States Patent No. RE39,071 ("the RE'071 patent") states on its face that it is entitled "Anhydro-and Isomer-A-21978C Cyclic Peptides" and further states that it was issued on April 18, 2006 and that an assignment was recorded in the PTO on April 23, 2007 assigning the RE'071 patent to Cubist. Upon information and belief, Teva USA admits that the RE'071 patent is listed in the FDA Orange Book as expiring on September 24, 2019. Teva USA further admits that what appears to be a true and correct copy of the RE'071 patent was attached to the Complaint as Exhibit C. Teva USA denies the remaining allegations of paragraph 16.

17. Teva USA admits that the '967, '689 and RE'071 patents have been listed in the FDA Orange Book in connection with CUBICIN®. Teva USA is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 17 of the Complaint and therefore denies the same.

18. Teva USA denies the allegations of paragraph 18 of the Complaint with respect to Teva USA. To the extent that paragraph 18 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

19. Teva USA denies the allegations of paragraph 19 of the Complaint with respect to Teva USA. To the extent that paragraph 19 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

20. Teva USA admits the allegations of paragraph 20.

**COUNT 1**
**U.S. PATENT NO. 6,468,967**

21. In response to the allegations contained in paragraph 21 of the Complaint, Teva USA realleges its responses to paragraphs 1-20 as if fully set forth herein.

22. Teva USA denies as to Teva USA that all future uses of the TPM ANDA Product in accord with its proposed labeling would necessarily be covered by at least one claim of the '967 patent, given that the claims have not yet been construed, and further denies that any claims that might cover such future uses are valid and enforceable. To the extent that paragraph 22 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

23. Teva USA admits that it had knowledge of the '967 patent when TPM submitted the TPM ANDA to the FDA. To the extent that paragraph 23 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

24. Teva USA denies the allegations of paragraph 24 of the Complaint with respect to Teva USA. To the extent that paragraph 24 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

25. Teva USA denies the allegations of paragraph 25 of the Complaint with respect to Teva USA. To the extent that paragraph 25 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

26. Teva USA denies that the use of the TPM ANDA Product in accordance with and as directed by TPM's proposed labeling would infringe any valid and enforceable claim of the '967 patent. To the extent that paragraph 26 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

27. Teva USA is without information or knowledge sufficient to form a belief as to the truth of the allegations of paragraph 27 with respect to Teva USA and therefore denies the same. To the extent that paragraph 27 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

28. Teva USA denies that it plans and intends to, and will, actively induce infringement of any valid and enforceable claim of the '967 patent and, because Teva USA is without information or knowledge sufficient to form a belief as to the truth of the allegation that it will take such action immediately and imminently upon approval of ANDA No. 91-039, Teva USA further denies the same. To the extent that paragraph 28 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

29. Teva USA denies knowledge that the TPM ANDA Product and its proposed labeling are especially made or adapted for use in infringing any valid and enforceable claim of the '967 patent and accordingly further denies that the TPM ANDA Product and its proposed

labeling are not suitable for substantial noninfringing use. Teva USA further denies that Teva USA plans and intends to, and will, contribute to infringement of any valid and enforceable claim of the '689 patent and, because Teva USA is without information or knowledge sufficient to form a belief as to the truth of the allegation that it will take such action immediately and imminently upon approval of ANDA No. 91-039, Teva USA further denies the same. To the extent that paragraph 29 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

30. Teva USA denies with respect to Teva USA. To the extent that paragraph 30 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

31. Teva USA denies with respect to Teva USA. To the extent that paragraph 31 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

32. Teva USA denies the allegations in paragraph 32 of the Complaint.

**COUNT II**
**U.S. PATENT NO. 6,852,689**

33. In response to the allegations contained in paragraph 33 of the Complaint, Teva USA realleges its responses to paragraphs 1-32 as if fully set forth herein.

34. Teva USA denies as to Teva USA that all future uses of the TPM ANDA Product in accord with its proposed labeling would necessarily be covered by at least one claim of the '689 patent, given that the claims have not yet been construed, and further denies that any claims that might cover such future uses are valid and enforceable. To the extent that paragraph 34 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

35. Teva USA admits that it had knowledge of the '689 patent when TPM submitted the TPM ANDA to the FDA. To the extent that paragraph 35 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

36.     Teva USA denies the allegations of paragraph 36 of the Complaint with respect to Teva USA. To the extent that paragraph 36 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

37.     Teva USA denies the allegations of paragraph 37 of the Complaint with respect to Teva USA. To the extent that paragraph 37 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

38.     Teva USA denies that the use of the TPM ANDA Product in accordance with and as directed by TPM's proposed labeling would infringe any valid and enforceable claim of the '689 patent. To the extent that paragraph 38 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

39.     Teva USA is without information or knowledge sufficient to form a belief as to the truth of the allegations of paragraph 39 with respect to Teva USA and therefore denies the same. To the extent that paragraph 39 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

40.     Teva USA denies that it plans and intends to, and will, actively induce infringement of any valid and enforceable claim of the '689 patent and, because Teva USA is without information or knowledge sufficient to form a belief as to the truth of the allegation that it will take such action immediately and imminently upon approval of ANDA No. 91-039, Teva USA further denies the same. To the extent that paragraph 40 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

41.     Teva USA denies knowledge that the TPM ANDA Product and its proposed labeling are especially made or adapted for use in infringing any valid and enforceable claim of the '689 patent. Teva USA further denies that the TPM ANDA Product and its proposed

labeling are not suitable for substantial noninfringing use with respect to one or more of the claims of the '689 patent. Teva USA further denies that Teva USA plans and intends to, and will, contribute to infringement of any valid and enforceable claim of the '689 patent and, because Teva USA is without information or knowledge sufficient to form a belief as to the truth of the allegation that it will take such action immediately and imminently upon approval of ANDA No. 91-039, Teva USA further denies the same. To the extent that paragraph 41 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

42. Teva USA denies with respect to Teva USA. To the extent that paragraph 42 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

43. Teva USA denies with respect to Teva USA. To the extent that paragraph 43 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

44. Teva USA denies the allegations in paragraph 44 of the Complaint.

**COUNT III**
**U.S. PATENT NO. RE 39,071**

45. In response to the allegations contained in paragraph 46 of the Complaint, Teva USA realleges its responses to paragraphs 1-44 as if fully set forth herein.

46. Teva USA denies as to Teva USA that all TPM ANDA Products and all future uses of the TPM ANDA Product in accord with its proposed labeling would necessarily be covered by at least one claim of the RE'071 patent, given that the claims have not yet been construed, and further denies that any claims that might cover such future product and future uses are valid and enforceable. To the extent that paragraph 46 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

47.   Teva USA admits that it had knowledge of the '689 patent when TPM submitted ANDA No. 91-039 to the FDA. To the extent that paragraph 47 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

48.   Teva USA denies the allegations of paragraph 48 of the Complaint with respect to Teva USA. To the extent that paragraph 48 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

49.   Teva USA denies the allegations of paragraph 49 of the Complaint with respect to Teva USA. To the extent that paragraph 49 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

50.   Teva USA is without information or knowledge sufficient to form a belief as to the truth of the allegations of paragraph 50 with respect to Teva USA and therefore denies the same. To the extent that paragraph 50 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

51.   Teva USA denies with respect to Teva USA. To the extent that paragraph 51 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

52.   Teva USA denies with respect to Teva USA. To the extent that paragraph 52 makes allegations directed to TPM and Teva Ltd., no response is required from Teva USA.

53.   Teva USA denies the allegations in paragraph 53 of the Complaint. Teva USA further answers that any allegations in the Complaint requiring a response from Teva USA not specifically admitted are denied.

### ANSWER TO PRAYER FOR RELIEF

Teva USA denies that Plaintiff is entitled to the judgment and relief prayed for in paragraphs (a) through (g) of the Complaint.

## FIRST DEFENSE

The manufacture, use, offer for sale, sale or importation of the TPM ANDA Product that is the subject of ANDA No. 91-039 does not and will not infringe, either literally or under the doctrine of equivalents, one or more claims of each of the '967, '689 and RE'071 patents.

## SECOND DEFENSE

The claims of each of the '967, '689 and RE'071 patents are either (1) not infringed, either literally or under the doctrine of equivalents, by the TPM ANDA Product or its use in accord with the labeled instructions and/or (2) are invalid under one or more of 35 U.S.C. § 102, § 103, § 112 and/or the doctrine of obviousness-type double patenting over U.S. Patent No. 4,537,717.

## THIRD DEFENSE

The claims of the RE'071 patent are also invalid for failure to meet the requirements of 35 U.S.C. § 251 and the certificate of correction issued for the RE'071 patent is invalid for failure to meet the requirements of 35 U.S.C. § 255.

## FOURTH DEFENSE

The Complaint fails to allege that Teva USA has taken any action constituting an act of infringement under the patent laws of the United States of America and therefore fails to state a cause of action against Teva USA.

## FIFTH DEFENSE

The Complaint fails to state a cause of action against Teva USA for a declaratory judgment under 28 U.S.C. § 2201.

## SIXTH DEFENSE

Unenforceability of the '967 and '689 Patents Due to Inequitable Conduct Before the U.S.

Patent and Trademark Office

1.      All claims of the '967 and '689 patents are unenforceable due to inequitable

conduct before the PTO during the prosecution of the corresponding U.S. Patent Application

No. 09/406,568 ("the '568 application"). The '568 application was filed on September 24,

1999, and issued as the '967 patent on October 22, 2002. The '689 patent issued on February 8,

2005 from U.S. Patent Application No. 10/082,544, which was a continuation of the '568

application.

2.      Frederick B. Oleson ("Oleson"), is a named inventor of both the '967 and '689

patents. As such, he owed a duty of candor and duty of disclosure to the PTO with respect to

and during the prosecution of the '568 application. 35 C.F.R. 1.56.

3.      As detailed below, Oleson breached his duty of candor, good faith and duty of

disclosure to the PTO and engaged in inequitable conduct during the prosecution of the '568

application with an intent to deceive the PTO by knowingly submitting a declaration containing

materially false statements dated September 11, 2000. In that Declaration he falsely asserted

that the 6 hour daptomycin half-life in rabbits disclosed in the reference cited by the Examiner

was calculated in infected rabbits and thus could not be used to calculate an equivalent human

dosing interval. Having falsely rejected the actual half-life data reported in that reference,

Oleson went on to then misleadingly extrapolate a much lower half-life value for daptomycin in

rabbits based on information from other species. As further detailed below, applicants would

not have been able to argue that the prior art reference did not anticipate or render obvious then

pending claims in the '568 application if Oleson had calculated the dosing interval using the 6

hour daptomycin half-life in rabbits disclosed in the prior art on which the Examiner based his rejection.

4. After the '568 application was filed on September 24, 1999, the Examiner of the '568 application issued an Office Action on April 11, 2000, rejecting claims 1-10, 16-20, 23, 26, and 32 of the '568 Application as anticipated by, or rendered obvious over, Kennedy et al. *Antimicrobial Agents and Chemotherapy* 33:1522-25, 1989 ("Kennedy"). Specifically, the Examiner stated the following:

> Kennedy et al. expressly disclose a method of administering daptomycin at a dose of 10 mg/kg as a single daily dose falling within the scope of applicant's claims.
>
> Alternatively, at the very least the claimed invention is rendered obvious within the meaning of 35 USC 103, because the prior art discloses products and uses that contain the same exact ingredients/components as that of the claimed invention.

April 11, 2000 Office Action at p. 4.

5. On September 11, 2000, Oleson submitted a Declaration to the PTO (the "Oleson Declaration") in response to the April 11, 2000 Office Action, in which he asserted that Kennedy did not anticipate or render obvious the pending claims of the '568 application because the administration of 10 mg/kg of daptomycin every 24 hours to rabbits disclosed in Kennedy was not equivalent to daptomycin administration of 10 mg/kg every 24 hours to a human patient. Oleson Declaration at ¶ 4.

6. In support of this assertion, Oleson further stated in his Declaration that "[t]o achieve comparable exposure in a non-human animal and the human patient at a given dose, either the half-lives of the human and non-human animal must be comparable or the dosing interval must be adjusted such that the ratio of the dosing interval to the half-life is equivalent between the species." Oleson Declaration at ¶ 6.

13

7.     The half-life ($t_{1/2}$) of daptomycin in rabbits disclosed in <u>Kennedy</u> at page 1523 was "approximately 6 h[ours]." In order to discredit that disclosed half-life value, Oleson falsely stated in his Declaration that "although <u>Kennedy</u> estimated a half-life of 6 hours for rabbits, the estimation was performed using rabbits that had experimentally-induced aortic valve endocarditis," citing to <u>Kennedy at 1523</u>. Oleson Declaration at ¶ 9, footnote. Nothing on page 1523 or either of the two other pages of <u>Kennedy</u> supports Oleson's assertion that <u>Kennedy</u> calculated the half-life for daptomycin in infected rabbits. Contrary to Oleson's assertion, <u>Kennedy</u> makes clear that the approximately 6 hour half-life value was not based on the studies that <u>Kennedy</u> performed on infected rabbits.

8.     In fact, <u>Kennedy</u> cited to an article by Bush et al., published in 1988 entitled "Daptomycin (LY146032) Treatment of Experimental Enterococcal Endocarditis," published in *Antimicrobial Agents and Chemotherapy* 32:877-881 ("<u>Bush 1988</u>") as the source for the rabbit half-life value. Specifically, <u>Kennedy</u> states that "[b]ecause of its long half-life [citing to <u>Bush 1988</u>] daptomycin may be effective as a single daily dose", and that "[t]he long half life of daptomycin (approximately 6 h in rabbits), and therefore, its sustained effect may account in part for its superiority to standard regimens using single doses of drugs with relatively short half-lives." <u>Kennedy</u> at 1522, 1523.

9.     <u>Bush 1988</u> expressly discloses that the half-life it reported for daptomycin in rabbits was determined in *uninfected* rabbits. <u>Bush 1988</u> at 878. The mean half-life of 10 mg/kg of daptomycin injected in uninfected rabbits was reported as 5.8 ± 0.7 hours. <u>Bush 1988</u> at 879. <u>Kennedy</u>'s disclosure of a half-life of "approximately 6 hours" in rabbits accurately reports the half-life value for daptomycin in uninfected rabbits reported by <u>Bush 1988</u>.

10.     Upon information and belief, Oleson knew at the time he submitted his Declaration that the 6 hour half-life for daptomycin in rabbits disclosed in <u>Kennedy</u> was not based on measurements done in infected animals, but instead was based on information disclosed in Bush 1988 reporting half-life of daptomycin in uninfected rabbits. Oleson is a toxicologist by training and, at the time he submitted his declaration, he had been working for more than two years on developing daptomycin for Cubist. The <u>Kennedy</u> article is only 3 pages long and cites to only 7 references. The second sentence of <u>Kennedy</u> reports that daptomycin has "a long half life" and cites <u>Bush 1988</u> to support that statement. The specific information about the $5.8 \pm 0.7$ hour half-life of daptomycin in rabbits is expressly set forth in Table 3 of <u>Bush 1988</u>. Given the fact that the entire focus of Oleson's Declaration was on the need to distinguish the daily dose of daptomycin administered to rabbits in <u>Kennedy</u> from the claimed daily doses in human patients in the '568 application, Oleson must have been aware of the <u>Bush 1988</u> rabbit half-life data for daptomycin at the time he prepared his Declaration in response to the Examiner's rejection of the pending claims based on <u>Kennedy</u>.

11.     At the time Oleson submitted his Declaration, Cubist, Oleson's employer and the assignee of the pending '568 application, was a small pharmaceutical company that did not then have any approved product to sell. Upon information and belief, daptomycin was the primary product being developed by Cubist in 2000. It was not known then when FDA approval to market daptomycin would be obtained. Without a new patent covering a method of administration of daptomycin, Oleson knew that Cubist faced the significant prospect that it would have no patent coverage at the time that it finally obtained FDA approval to market daptomycin.

12.     After falsely asserting that the approximately 6 hour half-life value reported in Kennedy for daptomycin administered to rabbits was calculated using infected rabbits, Oleson then extrapolated a "predicted" half-life value for daptomycin in uninfected rabbits of 2.4 hours using a mathematical equation derived from a purported correlation between body weights in other animal species (rats, monkeys and dogs) and humans and daptomycin half-lives in those species. Oleson Declaration at ¶ 10 and Exhibit A.

13.     On information and belief, Oleson knew that the extrapolation was not appropriate for predicting the half-life of daptomycin in rabbits because it produced a result that was less than 50% of the actual daptomycin half-life in uninfected rabbits reported in Bush 1988. Nevertheless, based on his false and misleading extrapolation of a half-life of 2.4 hours for daptomycin in rabbits, Oleson asserted that "to achieve the equivalent dosing interval in humans as in rabbits, daptomycin would have to be administered to a human *once every 85 hours*." Id. at ¶ 11 (emphasis added). Therefore, Oleson falsely declared that "a rabbit dose of 10 mg/kg every 24 hours is equivalent to a 2.97 mg/kg dose in humans every 85 hours ... [or] *0.84 mg/kg every 24 hours, which is below the claimed range*." Id. at ¶ 12 (emphasis added). In addition, Oleson further falsely averred that "Kennedy would not motivate one to administer a dose of 3-75 mg/kg every 24 hours to a human because one of ordinary skill in the art would recognize that the equivalent human dose to a dose of 10mg/kg every 24 hours in a rabbit would be only 0.84 mg/kg every 24 hours." Id. at ¶ 12.

14.     Upon information and belief, using Kennedy's disclosed half-life of daptomycin in rabbits of about 6 hours, Oleson knew that a dosing interval of once every 24 hours was equivalent to 4 daptomycin half-lives. Because Oleson reported that daptomycin in man has a half-life of 8.5 hours, four daptomycin half-lives in man is equal to a dosing interval in man of

once every 34 hours (4 x 8.5 = 34). This translates into a 2.97 mg/kg dose in humans every 34 hours, not the 2.97 mg/kg every 85 hours asserted by Oleson at ¶ 11 of his Declaration.

15.    Using the dosing conversion based on Kennedy's disclosed 6 hour half-life in uninfected rabbits results in a daptomycin dosing regime (dose and dose interval) in humans that falls within the limitations of several of the pending claims in the '568 application. Thus Oleson knew at the time he submitted his September, 2000 Declaration that using the rabbit half-life data reported in Kennedy to calculate an equivalent human dose amount and dose interval would not avoid Kennedy as a reference that anticipated or rendered obvious those pending claims.

16.    Oleson's Declaration to the PTO falsely discounting Kennedy's disclosed half-life of daptomycin in rabbits was material to the patentability of the claims of the '568 application. By falsely stating that the half-life of daptomycin in rabbits disclosed in Kennedy was based on infected rabbits, and therefore could not be used to calculate the equivalent dosing interval from rabbits to humans, Oleson was able to use an extrapolation to estimate falsely a dosing interval for daptomycin in humans that was outside the dose interval specified in the pending claims.

17.    Oleson's false statements were material to at least claims 1-8 which were pending at the time the Declaration was submitted.  These claims each claim a method of administering daptomycin by administering various dose amounts of daptomycin at various dosage intervals, all of which include 3 mg/kg every 34 hours. But for Oleson's false statements to the PTO regarding the 6 hour half-life in rabbits disclosed in Kennedy, the examiner would have recognized that, even after the rabbit dose amount and dosing interval disclosed in Kennedy were converted to an equivalent human dose and dosing interval, Kennedy still anticipated or rendered obvious these claims.

18.     Oleson's false statements were also material to several of the issued claims asserted in this case. As alleged above, an appropriate conversion from rabbit to human dosing, using the 6 hour rabbit half-life disclosed in Kennedy, results in a human dose regimen of 2.97 mg/kg dose every 34 hours. Thus, Kennedy anticipates and/or renders obvious at least asserted, issued claims 3-5 of the '967 patent.

19.     Upon information and belief, Oleson's false and misleading statements regarding Kennedy submitted in his Declaration were made with an intent to deceive the PTO. Because Oleson made an affirmative misrepresentation to the PTO regarding the daptomycin half-life in rabbits disclosed in Kennedy, he must have carefully read Kennedy and Bush 1988, which was clearly cited by Kennedy as support for the information regarding the rabbit half-life of daptomycin on which Kennedy relied. Making affirmatively false statements in a sworn declaration submitted to the PTO demonstrates an intent to deceive.

20.     An inference of Oleson's specific intent to deceive the PTO is further demonstrated by the fact that, at the time he submitted his Declaration, the basic compound patent covering daptomycin (US Patent No. 4,537,717) was due to expire on August 27, 2002 and thus the need for a new patent was critical.

21.     Kennedy presented a significant threat to patentability because it disclosed a method of administering daptomycin that anticipated several claims of the '568 application and rendered even more of the claims obvious and had been cited by the Examiner as the basis for rejecting such claims. Therefore, Oleson knew that he had to overcome the rejection based on Kennedy to salvage the patentability of the pending method of administration claims.

22.    Upon information and belief, under the circumstances alleged above, there can be no plausible good faith explanation for Oleson's false statement to the U.S. PTO and the inference that he intended to deceive the PTO is the single most reasonable inference.

## RELIEF REQUESTED

Wherefore, Teva USA respectfully requests that this Court:

A. Enter judgment that TPM's proposed Daptomycin for Injection (500 mg/vial) product and its use in accord with the labeled instructions do not infringe any valid and enforceable claim of U.S. Patent Nos. 6,468,967, 6,852,689 and RE39,071;

B. Enter an order dismissing the Complaint, with prejudice, and denying Cubist the relief requested in its Complaint and any relief whatsoever;

C. Declare this case exceptional and award Teva USA its reasonable attorney's fees and costs incurred in this litigation; and

D. Grant such other and further relief as the nature of the case may require and as the Court may deem just, proper and equitable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Francis C. Lynch
Laurie S. Gill
Charles H. Sanders
Sundar Subramanyam
Kelley E. Walsh
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
Tel: (617) 570-1000

Michael Beck
Lauren M. Nowierski
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel: (212) 813-8800

Dated: September 20, 2010
970208 /34185

By: */s/ David E. Moore*
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19899
    Tel: (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Defendants*
*Teva Parenteral Medicines, Inc.,*
*Teva Pharmaceuticals USA, Inc., and*
*Teva Pharmaceuticals Industries Ltd.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on September 20, 2010, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on September 20, 2010, the attached document was Electronically Mailed to the following person(s):

Jack B. Blumenfeld
Maryellen Noreika
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
Wilmington, DE 19899
jblumenfeld@mnat.com
mnoreika@mnat.com

William F. Lee
Lisa J. Pirozzolo
Michael Heyison
Kathryn M. McLeod
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
william.lee@wilmerhale.com
lisa.pirozzolo@wilmerhale.com
michael.heyison@wilmerhale.com
kathryn.mcleod@wilmerhale.com

Kate Hutchins
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY 10022
kate.hutchins@wilmerhale.com

*/s/ David E. Moore*
Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

911693 / 34185